IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 25 - |
| v. | : | DATE FILED: _____ |
| DARYL F. HELLER | : | VIOLATIONS: |
| | | 15 U.S.C. § 78j(b), 78ff, and 17 C.F.R. |
| | : | § 240.10b-5 (securities fraud – 1 count) |
| | | 18 U.S.C. § 1343 (wire fraud – 4 counts) |
| | : | Notice of forfeiture |

### I N D I C T M E N T

#### COUNT ONE

**THE GRAND JURY CHARGES THAT:**

At all times material to this indictment:

1. Defendant DARYL F. HELLER was a resident of Lititz, Pennsylvania, in the Eastern District of Pennsylvania.

2. Defendant DARYL F. HELLER controlled and was the majority owner of several companies, each of which had its principal place of business in Lancaster, Pennsylvania, in the Eastern District of Pennsylvania, including Paramount Management Group, LLC ("Paramount"), Prestige Investment Group, LLC ("Prestige"), and Heller Capital Group LLC ("HCG").

3. HCG was registered in Delaware as a limited liability company in or about December 2013. Defendant DARYL F. HELLER was the Chief Executive Officer ("CEO") of HCG and owned 99.5 percent of HCG.

4. Paramount was registered in Pennsylvania as a limited liability company in or about October 2011. Defendant DARYL F. HELLER was the chairman of Paramount's

board and, via HCG, owned approximately 83 percent of Paramount. According to documents provided to investors, defendant HELLER had "absolute control of Paramount."

5.     Paramount purchased, installed, operated, maintained, and processed transactions for automatic teller machines ("ATMs") in the Eastern District Pennsylvania and throughout the country. Paramount provided different types of services for ATMs within its network. For instance:

a.     Paramount owned and operated ATMs. For these ATMs, Paramount collected the revenues generated by these ATMs and paid the expenses associated with these ATMs. Defendant DARYL F. HELLER caused Paramount to sell some of the ATMs owned by Paramount to third-party investors (including the Prestige and WF Velocity ATM Funds described below), but Paramount continued to operate the ATMs on behalf of the investors. For ATMs that Paramount owned, Paramount typically had a contractual agreement with the owner or lessee of the location where the ATM was located.

b.     Paramount also provided processing services, where Paramount would process ATM transactions for ATMs owned by third parties, in exchange for a fee. For processing customers, Paramount was not entitled to keep the ATM revenues generated by the ATMs, beyond revenues used to pay the fees that Paramount earned in exchange for performing the processing services. Because Paramount did not own the ATMs for which it provided processing services, these ATMs could not have been sold to investors.

6.     Paramount maintained records that showed information regarding the ATMs that it owned, operated, managed, and provided processing services for (the "Paramount ATM Network"), including, among other things: (i) the number of ATMs within the Paramount ATM Network; (ii) identifying information regarding these ATMs, including the location of the

ATM and the serial number and terminal identification number of the ATM; and (iii) the financial performance of these ATMs, including the amount of revenues generated and the expenses associated with the ATMs. As described below, defendant DARYL F. HELLER created and maintained, and caused others to maintain, a separate set of false and fraudulent records that grossly overstated the number of ATMs that Paramount purportedly sold to and operated for investors and grossly overstated the financial performance of these ATMs.

7.     Prestige was registered in Pennsylvania as a limited liability company in or about July 2011. Defendant DARYL F. HELLER was the CEO of Prestige and, via HCG, owned approximately 60 percent of Prestige.

8.     Prestige was the majority owner of four companies: Prestige Funds Management, LLC, Prestige Funds Management II, LLC, Prestige Funds Management III, LLC, and WF Velocity Funds Management, LLC (collectively, "Prestige Management Companies").

9.     The Prestige Management Companies, in turn, managed the operations of at least 26 companies, including: Prestige Fund A, LLC; Prestige Fund A II, LLC; Prestige Fund A IV, LLC; Prestige Fund A V, LLC; Prestige Fund A VI, LLC; Prestige Fund A VII, LLC; Prestige Fund A IX, LLC; Prestige Fund B, LLC; Prestige Fund B II, LLC; Prestige Fund B IV, LLC; Prestige Fund B V, LLC; Prestige Fund B VI, LLC; Prestige Fund B VII, LLC; Prestige Fund B BTM I, LLC; Prestige Fund D, LLC; Prestige Fund D III, LLC; Prestige Fund D IV, LLC; Prestige Fund D V, LLC; Prestige Fund D VI, LLC; Prestige Fund D BTM I, LLC; and Prestige Fund E I, LLC (collectively, the "Prestige ATM Funds"); and WF Velocity I, LLC; WF Velocity IV, LLC; WF Velocity V, LLC; WF Velocity VI, LLC; and WF Velocity VII, LLC (collectively, the "WF Velocity ATM Funds").

3

10.    Defendant DARYL F. HELLER, via his control and majority ownership of Prestige, controlled the Prestige ATM Funds and the WF Velocity ATM Funds (collectively, the "Prestige and WF Velocity ATM Funds") and Prestige Management Companies.

11.    From at least on or about January 1, 2017 to at least on or about June 10, 2024, defendant DARYL F. HELLER solicited, and caused others, including Persons #1, #2, #3, and #4, to solicit, investments in the Prestige and WF Velocity ATM Funds. During this period, approximately 2,700 investors in the Prestige and WF Velocity ATM Funds, including Investors #1, #2, #3, and #4, invested approximately $770 million, broken down by year as follows:

| Year | Approximate Amount Invested |
|------|------------------------------|
| 2017 | $25,740,000 |
| 2018 | $23,192,000 |
| 2019 | $52,780,000 |
| 2020 | $85,332,000 |
| 2021 | $158,622,400 |
| 2022 | $220,840,000 |
| 2023 | $189,136,000 |
| 2024 | $14,464,000 |

12.    DocuSign, Inc. ("DocuSign") was a software company that provided, among other services, an electronic signature software that enabled users to digitally sign contracts remotely, avoiding the need for in-person signatures. DocuSign used servers located outside of Pennsylvania to process and store documents signed using the DocuSign software.

13.    Juniper Square, Inc. ("Juniper Square") was an investment management software company that Prestige used to communicate with and provide account information to investors in the Prestige and WF Velocity ATM Funds. Juniper Square used servers located outside of Pennsylvania to process and store documents distributed using the Juniper Square software.

4

14.     Company #1 was a Wyoming limited liability company that was controlled by Person #1 and through which Person #1 and others solicited investors to invest in the Prestige ATM Funds.

15.     Company #2 was a Wyoming limited liability company that was controlled by Person #2 and through which Person #2 and others solicited investors to invest in the WF Velocity ATM Funds.

16.     Company #3 was an Arizona limited liability company that was controlled by Person #2 and through which Person #2 and others solicited investors to invest in the WF Velocity ATM Funds.

17.     Company #4 was a Georgia-based company that sold ATMs.  From in or about late 2020 to in or about 2023, Paramount agreed to purchase approximately 5,300 ATMs from Company #4.  Of the approximately 5,300 ATMs, only approximately 1,400 were ever shipped to Paramount.  The remaining approximately 3,900 ATMs were stored at all times in warehouses belonging to Company #4.  None of the ATMs purchased by Paramount from Company #4 or shipped to Paramount from Company #4 were ever operational or generated ATM revenues.

18.     Company #5 was a Florida-based company that on or about November 21, 2024, entered into an agreement with Paramount to purchase ATMs from Paramount in exchange for approximately $5,000,000, with the initial payment of approximately $3,600,000 payable to a creditor of Paramount.

19.     Company #6 was a Wisconsin-based company that on or about September 26, 2024, entered in an asset purchase agreement with Paramount to purchase from Paramount the processing rights for a portfolio of ATMs.

5

*Prestige and WF Velocity ATM Fund Investments*

20.     Defendant DARYL F. HELLER solicited, and caused others to solicit, investments in the Prestige and WF Velocity ATM Funds in denominations of $52,000, $104,000, and $120,000, depending on the specific fund.

21.     Defendant DARYL F. HELLER represented, and caused others to represent, to the Prestige and WF Velocity ATM Fund investors, many of whom resided in the Eastern District of Pennsylvania, among other things:

        a.     Paramount would use the investor money to purchase ATMs on behalf of investors;

        b.     Paramount would operate the ATMs, which were purportedly placed in service in various locations around the country, and Paramount would be responsible for paying expenses associated with the operation of the ATMs, including maintenance, insurance, liability, and general management;

        c.     In return for their investments, investors would receive a fixed payment every month for approximately seven years, and, for some investors, a percentage of advertising revenues generated by ATMs;

        d.     The fixed monthly payments would be funded by the revenues generated by the ATMs that the investors purportedly purchased and had been placed in service by Paramount;

        e.     For several Prestige and WF Velocity ATM Funds, if Paramount failed to perform its obligations to operate the ATMs and pay the investors, the investor or fund (depending on the type of fund) could take possession of the ATMs and all rights related to the

ATMs, including the location agreements between Paramount and the owner or lessee of the location where the ATMs were located; and

           f.      For several Prestige and WF Velocity ATM Funds, if the investment fund was unable to use the investor funds to purchase ATMs from Paramount within four months of investment, the investment would be "rescind[ed]" and the investment funds would be returned to the investor.

           22.      Defendant DARYL F. HELLER made, and caused other individuals to make, these representations regarding the ATM investment opportunity in the Prestige and WF Velocity ATM Funds in several ways, including through Private Placement Memoranda ("PPMs"), contracts that investors signed in connection with their investments, emails, text messages, phone calls, podcasts, websites, and investor presentations made via the Internet and in person, from the Eastern District of Pennsylvania and elsewhere.

           23.      In order to execute their investments, investors in the Prestige and WF Velocity ATM Funds (the "Prestige and WF Velocity ATM Fund investors") had to sign investment contracts, which were mostly signed via DocuSign and other electronic document signature applications. The investment contracts were signed by the investor and by defendant DARYL F. HELLER, or Prestige employees authorized to sign on behalf of defendant HELLER.

           24.      The language and type of investment contracts varied based on the structure of the specific fund. For approximately eight of the 26 Prestige and WF Velocity ATM Funds, investors entered into investment contracts called Venture Agreements, pursuant to which the investor owned the title to the ATMs that were purportedly purchased from Paramount (the "Venture Agreement Funds"). For the remaining approximately 18 Prestige and WF Velocity ATM Funds, investors entered into investment contracts called Limited Liability Company

7

Operating Agreements, pursuant to which the fund into which the investor invested owned the title to the ATMs that were purportedly purchased from Paramount and the investor owned a membership interest in the fund (the "Membership Interest Funds").

25.    After executing the investment contracts, the Prestige and WF Velocity ATM Fund investors sent their investment money to bank accounts associated with the ATM fund and funds in which they invested. Prestige employees then transferred the investment money to Paramount, which was supposed to use the money to purchase and operate ATMs.

26.    Paramount was responsible for collecting the ATM revenues generated by the ATMs that the investors purportedly purchased. Defendant DARYL F. HELLER represented that after Paramount collected the ATM revenue, Paramount would use the ATM revenue to pay, among other things: (i) monthly payments owed to the Prestige and WF Velocity ATM Fund investors; and (ii) monthly payments, called "margin payments," to the managers of the Prestige Management Companies, which were based on the financial performance of the ATMs purportedly owned by the Prestige and WF Velocity ATM Funds.

27.    Defendant DARYL F. HELLER, acting on behalf of Paramount, provided, primarily via email, Prestige employees with documentation that was intended to substantiate defendant HELLER's false representations that investor money was being used to purchase ATMs and that the ATMs were generating sufficient revenues to make investor payments. The documentation included:

a.    Bills of Sale, which contained the number of ATMs that defendant HELLER claimed were purchased with investor money and identifying information for the ATMs, such as a serial number and geographic location. The Bills of Sale typically identified the ATMs that Paramount purportedly sold to one of the Prestige and WF Velocity ATM Funds

8

in a specific quarter or year. Additionally, investors in the Venture Agreement Funds received Bills of Sale that listed the identifying information of the specific ATMs that the investor purportedly purchased because in the Venture Agreement Funds, the investor owned the ATMs.

                b.      ATM financial performance reports, which contained the number of ATMs that defendant HELLER claimed were purchased with investor money and the financial performance of these ATMs, including the number of transactions and the revenues generated from these transactions. Investors received distribution notices, which included portions of the financial information from the ATM financial performance reports sent to Prestige employees by defendant HELLER.

          28.      Prestige employees used the Bills of Sale and the ATM financial performance reports to, among other things: (i) ensure that investor money was being used to purchase ATMs and that the ATMs were generating sufficient revenues to make investor payments; (ii) respond to requests for information from third parties, including representatives of Company #1 and a bank that held interests in investors' investments; (iii) prepare, and assist with the preparation of, tax documents on behalf of the Prestige and WF Velocity ATM Funds and their investors; and (iv) calculate the amount of margin payments that the managers of the Prestige Management Companies, including defendant DARYL F. HELLER, were entitled to receive.

          29.      Beginning in or about June 2022, Prestige employees used Juniper Square to provide to the Prestige and WF Velocity ATM Fund investors information regarding their investments, including Bills of Sale and ATM investment performance reports. Before this time, Prestige employees provided information to investors via email and other document sharing platforms.

30.     In order to prepare the Bills of Sale, defendant DARYL F. HELLER created and maintained, and caused others to maintain, a document frequently referred to as the "Master Assignment" sheet, which contained information regarding the specific ATMs that Paramount purportedly sold to investors, including the Prestige and WF Velocity ATM Fund investors.  Due to defendant HELLER's misrepresentations while creating and maintaining the Master Assignment sheet, the Master Assignment sheet grossly overstated the true number of ATMs that Paramount, in truth, had sold to the investors.

31.     In order to prepare the ATM financial performance reports, defendant DARYL F. HELLER created and maintained reports that grossly overstated the true financial performance of the ATMs that Paramount had sold to the investors.

32.     Based on defendant DARYL F. HELLER's false representations regarding the financial performance of the ATMs purportedly owned by the Prestige and WF Velocity ATM Funds, defendant HELLER received, via payments to HCG, approximately $8 million in margin payments from 2020 to 2024.

*Defendant DARYL F. HELLER's Failure to Make Payments to Prestige and WF Velocity Investors, Subsequent Litigation, and the Alleged Buy-Out Proposal*

33.     From in or about January 2017 to in or about March 2024, Paramount made in a timely fashion substantially all its required monthly payments to the Prestige and WF Velocity ATM Fund investors.

34.     Starting in or about late 2023, Company #1 stopped soliciting investors for the Prestige ATM Funds due, in part, to defendant DARYL F. HELLER's refusal to provide Company #1 with information that Company #1 requested about the financial condition of Paramount and Prestige, including audited financial statements.

10

35.     Starting in or about April 2024, Companies #2 and #3 stopped soliciting investors for the WF Velocity ATM Funds.

36.     As a result of Companies #1, #2, and #3 no longer soliciting investors for the Prestige and WF Velocity ATM Funds, in or about April 2024, Paramount was no longer receiving from the Prestige and WF Velocity ATM Funds substantial amounts of new investor money.

37.     From in or about April 2024—when Paramount stopped receiving substantial amounts of new investor money—to in or about December 2024, defendant DARYL F. HELLER caused Paramount to stop making payments to the Prestige and WF Velocity ATM Fund investors.

38.     On or about April 29, 2024—one day before the April 2024 monthly payments were due—defendant DARYL F. HELLER sent, and caused to be sent, an email advising that, effective immediately, payments to the Prestige and WF Velocity ATM Fund investors would be made quarterly, with the first quarterly payment due on June 30, 2024.

39.     On or about June 25, 2024—five days before the quarterly payment was due—defendant DARYL F. HELLER sent, and caused to be sent, an email advising that the quarterly payment would be issued on July 10, 2024, but, contrary to defendant HELLER's representation, this payment was never made.

40.     On or about August 6, 2024, defendant DARYL F. HELLER sent, and caused to be sent, an email advising the Prestige and WF Velocity ATM Fund investors that they would not receive the quarterly payment that defendant HELLER previously promised and, instead, Paramount would "be offering a complete buyout to get everyone's capital back."

11

41.     On or about August 23, 2024, the Prestige and WF Velocity ATM Funds filed a lawsuit against Paramount in the Lancaster County Pennsylvania Court of Common Pleas, Case No. CI-24-06012, *Prestige and WF Velocity ATM Funds v. Paramount Management Group, LLC* (the "Prestige and WF Velocity Fund Litigation").

42.     On or about September 24, 2024, the parties in the Prestige and WF Velocity Fund Litigation and a related case entered into a stipulation pursuant to which the cases were stayed so that defendant DARYL F. HELLER could present the Prestige and WF Velocity ATM Fund investors with a buy-out proposal.

43.     On or about October 1, 2024, defendant DARYL F. HELLER held a virtual meeting during which he presented a buy-out offer to the Prestige and WF Velocity ATM Fund investors. Defendant HELLER claimed that the buy-out would be funded by entities that he refused to identify and would ensure that the investors received, at minimum, their principal back. Defendant HELLER further stated that if the investors accepted the offer, the first buy-out payment would be paid on October 21, 2024, and the final buy-out payment would be paid on November 20, 2024. Defendant HELLER's proposal provided that if the buy-out payments were not made in full, the Prestige and WF Velocity Fund Litigation and the related case would resume.

44.     On or about October 8, 2024, defendant DARYL F. HELLER reported via email that a majority of the Prestige and WF Velocity ATM Fund investors voted to accept the buy-out offer.

45.     The deadline for the first payment, which was scheduled for October 21, 2024, was extended numerous times at the request of defendant DARYL F. HELLER.

46.     On or about November 14, 2024, defendant DARYL F. HELLER signed a stipulation that was filed in the Prestige and WF Velocity Fund Litigation.  The stipulation provided that if the buy-out payments were not made by November 20, 2024, Paramount agreed: (i) not contest the entry of a judgment in the amount that was owed to investors in the Prestige and WF Velocity ATM Funds; (ii) to provide to the investors "a complete inventory of all ATM Units purchased by [the investors]"; and (iii) to assign and transfer to the investors the right, title, and interest in the ATMs and information necessary to operate the ATMs.

47.     After defendant DARYL F. HELLER failed to make the promised buy-out payment on November 20, 2024, on or about November 21, 2024, the court in the Prestige and WF Velocity Fund Litigation, consistent with the November 14, 2024 stipulation, entered judgment in favor the Prestige and WF Velocity ATM Funds in the amount of approximately $138,156,118.38 and required Paramount to provide the following information:

a.     By November 23, 2024: Paramount "**SHALL SUPPLY** to Plaintiffs [the Prestige and WF Velocity ATM Fund investors] a complete inventory of all ATMs Units purchased by Plaintiffs (or members of Plaintiffs) from [Paramount] (**Plaintiffs' ATM Units**)."

b.     By November 28, 2024: Paramount "**SHALL ASSIGN AND TRANSFER** to Plaintiffs: (1) all of [Paramount's] right, title, and interest to Plaintiffs' ATM Units; as well as (2) the Location Agreements, Permits, ATM passwords and combinations, and all vendor and other contracts or agreements relating to Plaintiffs' ATM Units (excluding the communication modems installed in any of Plaintiffs' ATM Units)."

48.     On or about December 2, 2024, defendant DARYL F. HELLER sent an email to a Paramount employee, attaching a list of approximately 28,000 ATMs, which

defendant HELLER falsely represented to be the inventory of the ATMs that Paramount sold to the Prestige and WF Velocity ATM Funds and their investors.

49.     On or about December 3, 2024, defendant DARYL F. HELLER received an email from a Paramount employee advising defendant HELLER that: (i) earlier that day, a Paramount employee compared the list of approximately 28,000 ATMs to Paramount's records and determined that serial numbers for only approximately 1,800 of the ATMs were identified as being a part of the Paramount ATM Network and only approximately 1,412 of those ATMs were active; and (ii) as a result, "there are only 1,412 active locations on the list of 28,000 serial numbers you provided."

50.     In response to the November 21, 2024 Court order requiring Paramount to provide an inventory of all the ATMs sold to the Prestige and WF Velocity ATM Funds and their investors, on or about December 5, 2024, defendant DARYL F. HELLER provided, and caused to be provided, to plaintiffs' counsel in the Prestige and WF Velocity Fund Litigation the list of approximately 28,000 ATMs, knowing that the information contained in the list was false.

51.     On or about December 10, 2024, a Paramount employee provided to plaintiffs' counsel in the Prestige and WF Velocity Fund Litigation transactional and identifying information regarding the approximately 9,984 ATMs within the Paramount Network at the time. Of the 9,984 listed ATMs, as of on or about March 13, 2025:

a.     Only approximately 5,028 of these ATMs were owned by the Prestige and WF Velocity ATM Funds and their investors;

b.     The remaining approximately 4,956 of these ATMs were owned by third parties other than the Prestige and WF Velocity ATM Funds and their investors; and

14

           c.       Only approximately 206 of the ATMs that were sold by Paramount to the Prestige and WF Velocity ATM Fund investors and owned by the Prestige and WF Velocity ATM Funds and their investors, were continuing to operate.

           52.      In or about the middle of December 2024, Paramount terminated a majority of its employees and ceased operations.

           53.      As of on or about August 21, 2025, the Prestige and WF Velocity ATM Funds investors had unpaid principal amounts totaling approximately $402,000,000.

           54.      Beginning no later than in or about January 2017:

           a.       The monthly gross profits earned by Paramount from the operation of the ATMs in the Paramount ATM Network—i.e., the total revenues generated by the ATMs subtracted by the direct expenses associated with operating the ATMs—was less than the monthly amounts that Paramount paid to the Prestige and WF Velocity ATM Fund investors and the Prestige Management Companies; and

           b.       As a result, in order to fund the monthly payments to the Prestige and WF Velocity ATM Fund investors and the Prestige Management Companies, Paramount used other sources of money, which included money obtained from new investors.

## THE SCHEME

           55.      From on or about January 1, 2017 to in or about December 2024, in the Eastern District of Pennsylvania, and elsewhere, defendant

## DARYL F. HELLER

willfully and knowingly, by the use of the means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, directly and indirectly, used and

employed manipulative and deceptive devices and contrivances in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon other persons in connection with the purchases and sales of securities—i.e., investments in the Prestige and WF Velocity ATM Funds.

## MANNER AND MEANS

It was part of the scheme that:

56.     Defendant DARYL F. HELLER solicited, and caused others to solicit, millions of dollars in funds from the Prestige and WF Velocity ATM Fund investors based on materially false and fraudulent pretenses, representations, and promises, including that: (i) the money invested by the Prestige and WF Velocity ATM Fund investors would be used by Paramount to purchase ATMs on behalf of the investors; and (ii) investors would receive a fixed amount every month from the revenues derived from the operation of the ATMs that were allegedly purchased by Paramount on behalf the investors.  In fact, and as defendant HELLER well knew:

a.     A substantial amount of the funds obtained from the Prestige and WF Velocity ATM Fund investors was not used by Paramount to purchase ATMs as promised. Rather, a substantial amount of the funds obtained from investors was used to pay the monthly payments owed to earlier investors in the Prestige and WF Velocity ATM Funds, other

16

Paramount investors, defendant HELLER's own personal expenses, and business debts incurred by Paramount and other companies that defendant HELLER owned and controlled; and

     b.  A substantial amount of the ATMs that were purportedly purchased by Paramount on behalf of the Prestige and WF Velocity ATM Fund investors and generating revenues used to fund the monthly payments to investors either: (i) did not exist; or (ii) were not in operation and, thus, were not capable of generating any revenues.

     57.  After defendant DARYL F. HELLER obtained the money from investors based on these materially false and fraudulent pretenses, representations, and promises, and in order to substantiate defendant HELLER's false representations, to convince more investors to invest, to prevent investors rescinding their investments and demanding their investment money back, and to conceal and delay detection of the scheme, defendant HELLER: (i) falsely represented, and caused others to falsely represent, to the Prestige and WF Velocity ATM Fund investors, Prestige employees, representatives of the Prestige and WF Velocity ATM Funds, and others that the money was being used for the approved purposes—i.e., the purchase of ATMs— and the monthly payments were derived from ATM revenues; and (ii) created, and caused the creation of, numerous false documents.

*Defendant DARYL F. HELLER's Fraudulent Misappropriation of Investor Money*

     58.  Contrary to defendant DARYL F. HELLER's representations that the investor money would be used to purchase ATMs and the monthly payments to investors were being funded through ATM revenues and in furtherance of the scheme, defendant HELLER caused Paramount to use money obtained from new investors in the Prestige and WF Velocity ATM Funds to fund the monthly payments owed to Prestige and WF Velocity ATM Fund investors who had invested previously, including, among other instances, when on or about

March 29, 2024, defendant HELLER, after directly soliciting an investment of over $1 million from Investor #1 in Prestige Fund B BTM I, including through an email from defendant HELLER to Investor #1 on March 26, 2024, caused Paramount to use Investor #1's investment money to repay earlier investors in the Prestige and WF Velocity ATM Funds, among other unauthorized expenses.

59.     Defendant DARYL F. HELLER also caused Paramount to use money obtained from the Prestige and WF Velocity ATM Fund investors to pay: (i) his personal expenses, including approximately $1.5 million for the purchase of a property in Sea Isle City, New Jersey; (ii) unauthorized business debts incurred by Paramount, including payments to lenders and investors other than those in the Prestige and WF Velocity ATM Funds; and (iii) expenses associated with other businesses owned or controlled by defendant HELLER.

60.     Defendant DARYL F. HELLER also caused Paramount to sell ATMs that were owned by the Prestige and WF Velocity ATM Funds and their investors, and to use the sale proceeds to pay unauthorized business debts incurred by Paramount, including when on or about November 21, 2024, defendant HELLER caused Paramount to sell ATMs to Company #5 and caused the initial payment of $3,600,000 to be paid to a creditor of Paramount, despite the fact that: (i) defendant HELLER previously caused Paramount to sell these ATMs to the Prestige and WF Velocity ATM Fund investors; and (ii) earlier on November 21, 2024, the Court in the Prestige and WF Velocity ATM Fund Litigation ordered Paramount, by November 28, 2024, to assign to the Prestige and WF Velocity ATM Fund investors all the ATMs that Paramount purchased on behalf of the investors.

*Defendant DARYL F. HELLER's Creation and Use of False Records Regarding the Number of ATMs Purportedly Purchased for Investors and ATM Performance*

61.     In order to substantiate defendant DARYL F. HELLER's false representations that the investor money was being used to purchase ATMs and monthly payments were being funded through ATM revenues, defendant HELLER created and maintained the Master Assignment sheet, which grossly overstated the true number of ATMs that Paramount had purchased on behalf of the investors.

62.     Using the information contained in the Master Assignment sheet, defendant DARYL F. HELLER created, and caused employees at Paramount to create, Bills of Sale that purported to identify the specific ATMs that had been sold to the various Prestige and WF Velocity ATM Funds. Defendant HELLER then provided these Bills of Sale to Prestige employees, in order to substantiate defendant HELLER's false representation that the Prestige and WF Velocity ATM Fund investors' money was being used to purchase ATMs.

63.     Defendant DARYL F. HELLER, through the Bills of Sale generated using the Master Assignment sheet, falsely represented to Prestige employees and others, including investors in the Venture Agreement Funds, that the money from the Prestige and WF Velocity ATM Fund investors was used by Paramount to purchase ATMs when, in fact, Paramount had largely not done so.

64.     As defendant DARYL F. HELLER knew, many of the ATMs listed on the Master Assignment sheet and in Bills of Sale that were delivered to Prestige employees: (i) did not exist; or (ii) were not in operation and, thus, were not capable of generating any revenues, including, among other instances, when from in or about 2020 to in or about 2023, defendant HELLER caused the Master Assignment sheet to reflect that Paramount sold to the Prestige and WF Velocity ATM Funds and their investors approximately 10,491 ATMs that were purportedly obtained from Company #4, when, in fact: (i) Company #4 shipped only approximately 1,400

19

ATMs to Paramount; (ii) Company #4 agreed to sell Paramount an additional approximately 3,900 ATMs but had never shipped those to Paramount; and (iii) none of the approximately 1,400 ATMs that Paramount obtained from Company #4 had ever been operational or generated any revenues.

65.    Additionally, defendant DARYL F. HELLER created ATM financial performance reports that reflected the financial performance of the ATMs purportedly purchased by the Prestige and WF Velocity ATM Fund investors.  Defendant HELLER provided these ATM financial performance reports to Prestige employees—who, in turn, used the reports to create distribution notices that were sent to the Prestige and WF Velocity ATM Fund investors— in order to substantiate defendant HELLER's false representation that the investor-victims' money was being used to purchase ATMs and the ATMs were producing sufficient revenues to fund monthly payments to the Prestige and WF Velocity ATM Fund investors.

66.    In fact, and as defendant DARYL F. HELLER knew, the ATM financial performance reports grossly overstated the number of transactions and revenues derived from the ATMs purportedly purchased by the Prestige and WF Velocity ATM Fund investors, including, among other instances, when on or about April 20, 2023, when defendant DARYL F. HELLER provided via email to a Prestige employee a report showing that in March 2023, the Prestige and WF Velocity ATM Fund investors were invested in portfolios containing at least approximately 25,368 ATMs, which earned "Kiosk Fee Revenue" of approximately $34,084,643 based on approximately 12,627,510 "Kiosk Transactions," when, in March 2023, the Paramount ATM Network had approximately 10,550 active ATMs, which conducted approximately 3,476,307 transactions and earned approximately $8,113,867 in total revenue and approximately $1,626,752 in gross profit.

67.     On or about April 25, 2023, Prestige employees uploaded to Juniper Square distribution notices, including one for Investor #2, that included portions of the false ATM performance figures provided by defendant DARYL F. HELLER on or about April 20, 2023.

68.     In order to further the scheme, conceal his fraudulent conduct, and delay detection of the scheme, defendant DARYL F. HELLER used his control over Paramount to ensure that he was solely responsible for delivering, primarily via email, to Prestige employees the false Bills of Sale and ATM financial performance reports.

69.     After in or about April 2024, when defendant DARYL F. HELLER caused Paramount to stop paying the Prestige and WF Velocity ATM Fund investors, defendant HELLER failed to provide Prestige employees with Bills of Sale and ATM financial performance reports.

### Additional False Representations by Defendant DARYL F. HELLER
### to Further the Scheme and Conceal and Delay Detection of the Scheme

70.     In order to further the scheme, conceal his fraudulent conduct, and delay detection of the scheme, defendant DARYL F. HELLER made, and caused to be made, false representations to individuals who solicited investments for the Prestige and WF Velocity ATM Fund investors, including, among other instances:

a.     On or about June 7, 2023, in response a request from defendant HELLER, a Paramount employee sent to defendant HELLER Paramount's profit and loss statements for the year ending 2022 and for April 2023 year to date.

b.     On or about June 22, 2023, in response to a request from Person #3, who was performing due diligence in order to determine whether it was appropriate to solicit investors for the WF Velocity ATM Funds, defendant HELLER: (i) used these profit and loss

21

statements as a guide to create documents that provided false information regarding WF Velocity

Fund V; and (ii) sent via email these false documents to Person #3. These documents falsely

stated, among other things, that WF Velocity Fund V had 831 "active" ATMs and these ATMs

generated approximately $7,423,878 in total revenue and $3,179,722 in gross profit in 2022 and

$3,900,989 in total revenue and $1,694,470 in gross profit for the first quarter of 2023, when, in

fact, as of the first quarter of 2023, Paramount records show that the 831 ATMs purportedly

purchased for WF Velocity Fund V either did not exist or were not generating any revenue.

71.    In order to conceal his fraudulent conduct and delay detection of the

scheme, from in or about April 2024 to in or about December 2024, defendant DARYL F.

HELLER made numerous false representations regarding why Paramount was unable to make

the required payments to the Prestige and WF Velocity ATM Fund investors and defendant

HELLER's efforts to buy out the Prestige and WF Velocity ATM Fund investors, including,

among other instances:

a.    In order to convince the Prestige and WF Velocity ATM Fund

investors to agree to extend the deadline for Paramount to make the first buyout payment, on or

about November 6, 2024, an attorney for defendant HELLER forwarded to an attorney for the

Prestige and WF Velocity ATM Funds an email from defendant HELLER, to which defendant

HELLER had attached three partially redacted documents. The email from defendant HELLER

stated that the documents were "asset purchase agreements for Paramount and affiliated entities,"

and the redacted documents purported to show that Paramount had entered into asset purchase

agreements totaling approximately $21,326,000, $37,400,000, and $47,000,000, respectively,

which could be used to pay the Prestige and WF Velocity ATM Fund investors, when, in fact,

and as defendant HELLER well knew, the three asset purchase agreements were not authentic

22

and, instead, were doctored versions of the authentic September 26, 2024 asset purchase agreement between Paramount and Company #6.

        b.     From in or about April 2024 to in or about October 2024, defendant HELLER stated in emails to and videoconferences with the Prestige and WF Velocity ATM Fund investors that Paramount was unable to make investor payments, in part, due to costs that Paramount would need to incur to comply with an ATM industry security standard called TR-31, which, according to Paramount records from on or about May 2, 2024, would cost Paramount approximately $9.87 million.

        c.     On or about August 6, 2024, in emails to the Prestige and WF Velocity ATM Fund investors, defendant HELLER falsely stated that Paramount would need to pay "$100M +/-" to comply with TR-31, despite the fact that a Prestige employee, in an email earlier that day, questioned defendant HELLER about the accuracy of the representation because "what do we have from Paramount to support the $100M of expected costs for TR-31[?]"

        All in violation of Title 15, United States Code, Sections 78j(b) and 78ff; and Title 17, Code of Federal Regulations, Section 240.10b-5.

## COUNTS TWO THROUGH FIVE

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      Paragraphs 1 through 54 of Count One are incorporated here.

2.      From on or about January 1, 2017 to in or about December 2024, in the

Eastern District of Pennsylvania and elsewhere, defendant

### DARYL F. HELLER

devised and intended to devise a scheme to defraud investors in the Prestige and WF Velocity

ATM Funds and to obtain the money and property of such investors by false and fraudulent

pretenses, representations, and promises.

### THE SCHEME

3.      Paragraphs 56 through 71 of Count One, alleging the manner and means

of the scheme, are incorporated here.

4.      Defendant DARYL F. HELLER used, and caused to be used, facilities of

interstate and foreign commerce to advance, further, and carry out this scheme.

### WIRINGS

5.      On or about each of the dates set forth below, in the Eastern District of

Pennsylvania, and elsewhere, defendant

### DARYL F. HELLER,

for the purpose of executing the scheme described above caused to be transmitted by means of

wire communication in interstate and foreign commerce the signals and sounds described below,

each transmission constituting a separate count:

24

| Count | Date | Description |
|-------|------|-------------|
| Two | April 25, 2023 | Distribution notice, further described in Paragraph 67, that was uploaded to Juniper Square by Prestige employees in the Eastern District of Pennsylvania and processed through Juniper Square servers located outside of Pennsylvania |
| Three | September 27, 2023 | Prestige Fund B VI, LLC investment contracts that were executed by Investor #3 in the Eastern District of Pennsylvania and processed through DocuSign servers located outside of Pennsylvania |
| Four | February 29, 2024 | Prestige Fund B VI, LLC investment contracts for Investor #4 that were executed by a Prestige employee in the Eastern District of Pennsylvania and processed through DocuSign servers located outside of Pennsylvania |
| Five | March 26, 2024 | Email, further described in Paragraph 58, from defendant HELLER in the Eastern District of Pennsylvania and processed through Microsoft servers located outside of Pennsylvania |

All in violation of Title 18, United States Code, Section 1343.

## NOTICE OF FORFEITURE

**THE GRAND JURY FURTHER CHARGES THAT**:

      1.    As a result of the violations of Title 15, United States Code, Sections 78j(b) and 78ff, and 17 C.F.R. § 240.10b-5; and Title 18, United States Code, Section 1343 set forth in this indictment, defendant

### DARYL F. HELLER

shall forfeit to the United States of America any property, real or personal, that constitutes or is derived from proceeds traceable to the commission of such violations, including but not limited to the sum of $770,106,400.

      2.    If any of the property subject to forfeiture, as a result of any act or omission of the defendant:

      (a)    cannot be located upon the exercise of due diligence;

      (b)    has been transferred or sold to, or deposited with, a third party;

      (c)    has been placed beyond the jurisdiction of the Court;

      (d)    has been substantially diminished in value; or

      (e)    has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property subject to forfeiture.

All pursuant to Title 28, United States Code, Section 2461(c), and Title 18,

United States Code, Section 981(a)(1)(C).

**A TRUE BILL:**



**GRAND JURY FOREPERSON**

*Salvatore L. Astolfi* for
**DAVID METCALF**
**United States Attorney**

No._ _ _ _ _ _ _ _ _ _

## UNITED STATES DISTRICT COURT

Eastern District of Pennsylvania

Criminal Division

THE UNITED STATES OF AMERICA

vs.

DARYL F. HELLER

INDICTMENT

Counts
**15 U.S.C. § 78j(b), 78ff, and 17 C.F.R. § 240.10b-5 (securities fraud – 1 count)**
**18 U.S.C. § 1343 (wire fraud – 4 counts)**
**Notice of forfeiture**

A true bill.

Foreperson

Filed in op
Of

Bail, $_____